UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMANDO MANRIQUEZ LEMUS,<br><br>　　　　　Petitioner,<br><br>　v.<br><br>W. L. MONTGOMERY,<br><br>　　　　　Respondent. | No. 1:18-cv-01345-AWI-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

　　　　Petitioner is currently in state prison serving a sentence of life with possibility of parole for his conviction of attempted premeditated murder. He filed the instant habeas action challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.　PROCEDURAL HISTORY**

　　　　On February 16, 2015, a Tulare County jury found Petitioner guilty of attempted, willful, deliberate, and premeditated murder, false imprisonment, and misdemeanor resisting a police officer. (Doc. 1 at 1.) See People v. Lemus, No. F071583, 2017 WL 1549930, at *1 (Cal. Ct. App. May 1, 2017). On March 26, 2015, the court sentenced him to a prison term of 27 years to life with possibility of parole. (Doc. 1 at 1.)

　　　　Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On May 1, 2017, the Fifth DCA affirmed judgment. Lemus, 2017 WL 1549930, at *6.

Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on July 12, 2017. Id. at *1.

On October 1, 2018, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on February 1, 2019. (Doc. 15.) On April 29, 2019, Petitioner filed a traverse. (Doc. 20.)

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

> The charges in this case stemmed from the stabbing of Gilberto Alvarado on July 16, 2013. Alvarado lived at 558 North Sunnyside, Apartment 2, in Porterville. Alvarado's apartment had two bedrooms and he rented his spare bedroom to an elderly couple. However, at the time of the stabbing, the elderly couple were away in Bakersfield for a few weeks for work, "picking grapes." Prior to the elderly couple moving in, Alvarado had rented the room to another man, Manuel, whom Alvarado had recently evicted with help from the police because of disputes over rent and food, as well as Manuel's aggressiveness.
>
> Alvarado and Lemus had known each other since Alvarado arrived in Terra Bella, when Alvarado was 17 or 18 years old and Lemus only 12. They were distant relatives, and Alvarado lived with Lemus and his family upon his arrival in the country and developed a close relationship with them. At the time of the stabbing, Alvarado was in his early 30's and Lemus was 26.
>
> Over the years, Alvarado and Lemus became best friends. They would socialize and drink together frequently, and, for a time, both lived at the 558 North Sunnyside apartment complex. Initially, Alvarado lived on the ground floor in apartment 2, a two-bedroom apartment, with his wife and two kids, and Lemus upstairs in apartment 11, a one-bedroom apartment. In December 2010, they temporarily swapped apartments because Alvarado had gotten divorced and Lemus needed a larger apartment to accommodate his growing family. Lemus lived in apartment 2 for about two years. In January 2013, when Lemus moved out to live with his mother, Alvarado again took over apartment 2. Alvarado lived at the apartment complex for about four years in all.
>
> Around the time Lemus moved from the complex, Alvarado joined a nearby Apostolic or Jehovah's Witness church. As a result of his new church affiliation, Alvarado changed his lifestyle and began associating with a new group of people. He stopped drinking and socializing with Lemus. Alvarado testified that he and Lemus no longer saw each other because "I would congregate with a church and he would not come over to visit with me." Other relatives, possibly including Lemus's mother, were also upset with Alvarado over his decision to join a non-Catholic church.
>
> On July 16, 2013, Alvarado spent the day picking grapes. Thereafter, he went to

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

church, which was around the corner from his apartment. After church, at about 9:00 p.m. or 9:30 p.m., he walked back to his apartment complex. When he got there, he saw his neighbors gathered at an outdoor barbecue in the central courtyard area of the complex; there were about 10 people present. Someone called out to him that Lemus was there to see him, so Alvarado went over to the area. Alvarado thought it was "strange since [Lemus] hadn't come over in six, seven months." Lemus, who was acquainted with the neighbors, was drinking a beer and told Alvarado he had been waiting for him for two to three hours. Alvarado hugged Lemus and asked why he did not come by to visit anymore. Lemus responded, "I'm now aware that you're walking around with the Bible in your hand." Alvarado noticed that Lemus was "tipsy" but stayed outside to talk to him.

At one point, Lemus took a pocketknife from his pocket and commented, "Tonight, blood's going to run." Alvarado was alarmed as he took the comment to mean that Lemus intended to murder someone. He tried to reason that Lemus "was just playing," but when Lemus added, "I've sold my soul to the devil," Alvarado got seriously concerned. Lemus repeatedly asked Alvarado "to drink, to drink." Alvarado reluctantly took a beer even though he did not want to drink, because Lemus "had a knife in his hands" and Alvarado "was in fear." Alvarado nursed the beer slowly, taking only small sips, because he knew if he finished it, Lemus would offer him another. During this time, Lemus managed, either deliberately or accidentally, to cut his hand with his knife. As his hand began to bleed, Lemus told Alvarado, "Take off your shirt so that I can wipe myself up." Alvarado did as told, assuming this was all Lemus meant when he said that blood was going to run that night.

After about an hour or so, Lemus asked Alvarado, "Is your apartment open? Open it. I want to speak with you." They walked over to Alvarado's apartment and Alvarado unlocked the front door; he always locked his front door (there was no back door) and closed his windows before going out. As they went in, Alvarado left the door ajar, assuming they would come out quickly. Either Alvarado or Lemus may have turned on the lights as they went in; however, Alvarado was not entirely clear on this point and later testified the apartment "was entirely dark." Lemus led the way as they went in; he went through the living room to Alvarado's bedroom in the back of the apartment, where "he started opening up drawers." Alvarado thought Lemus's behavior was "strange" and wondered what he was looking for but did not say anything. Lemus asked Alvarado whether Manuel still lived with him, and Alvarado clarified that he did not. Alvarado also told Lemus that he had rented the spare bedroom to a couple who were away for approximately eight weeks. Lemus then sat down on the bed, as did Alvarado. Lemus did not have the knife in his hand at that point.

Lemus turned to Alvarado and asked, "Why is it that you no longer want to drink?" Alvarado responded, "I no longer want to live that way." Lemus said, "And so you think you're a bigger fucker than me." "No," Alvarado explained, "I no longer want to go like that. I have two children." Alvarado testified, all of a sudden "I just felt his left hand on my chest" and felt him "stabbing me in the stomach" with his right hand. Alvarado saw the knife—it was the same one that Lemus was holding earlier.

Alvarado tried to get up but Lemus stood up too and continued to stab Alvarado in the stomach. Alvarado testified, "[H]e tried to stab me in my chest, but I put my hands up so his knife went through my hand." As Lemus retracted the knife from Alvarado's hand, Alvarado fell to the floor face down. Alvarado deliberately collapsed in an extremely cramped space—no more than two feet wide—between the bed and the dresser, in the futile hope that it would deter Lemus from continuing

3

with the attack.

Alvarado also tried to reason with Lemus, saying, "[L]eave me alone. You've made holes all over me," but Lemus proceeded to stab him numerous times in the back and kept trying to get at his heart. Alvarado tried to protect himself. He testified: "I just placed my heart down toward the bottom" because "I believed that if he didn't touch my heart, I would remain longer with life." Despite these efforts, Alvarado thought he "was going to die."

At that point, someone knocked on the front door. Alvarado told Lemus that it was possibly Alvarado's aunt, checking up on him. Alvarado testified, "[Lemus] stopped stabbing me and he went toward the door to see who was there. And I heard a neighbor tell him, 'Hey, [Lemus], you stabbed him.' I didn't hear [Lemus] say anything. All I heard was a slam of the door." The neighbor who had come to the door was called Marcos; he lived "[f]ive apartments down" from Alvarado's apartment and was at the barbecue that night. After the brief encounter with Marcos, Lemus closed the front door.

Left alone in his bedroom, Alvarado said a prayer and then took his "phone out [of his pocket] and dialed 9–1–1." Alvarado testified, "I said 'Please come help me,' and I gave them the address where I lived. I recall repeating '558 Sunnyside, Apartment 2; please come and help me.'" Alvarado called 911 more than once to alert the dispatcher to his predicament. He testified, "At that time I was speaking very slowly, 'cause I took a stabbing to my lung. He tore it up. Every time that I speak, I could see that a lot of blood was flowing out from the top of me." As he made the calls, the lights were off and, indeed, the "apartment was entirely dark," but there was enough light seeping in from outside to create some visibility inside.

The police responded to Alvarado's call "right away." Alvarado gathered from various sounds in the apartment that Lemus was upset. Lemus went to the bathroom to wash his hands at the sink—Alvarado heard the water running in the sink. Then, Marcos, the neighbor who had come to the front door earlier, again came to the apartment; Alvarado heard him say from outside, "[Lemus], open the door. The police is here." Alvarado testified, "All I heard [Lemus] say, 'Who called them?' And I heard my neighbor say, 'I don't know.'" Lemus then came back in the bedroom and shone a light from his phone on Alvarado's face. Alvarado, who was lying partially on his left side, played dead; he "stopped breathing" and kept his "eyes open" without blinking. Lemus stabbed him one more time in his back before leaving. Alvarado then heard the bathroom window being opened and thought, "He's going to escape through there." However, at that point, the police were inside Alvarado's apartment. Alvarado heard Lemus say, a couple of times, "It wasn't me."

Porterville Police Department Detective Steven Ward was dispatched to the apartment complex around 10:15 p.m. on July 16, 2013, and arrived there four minutes later. As he approached apartment 2, he saw the apartment's front door was open and Lemus was standing at the interior threshold; two young men standing outside the door were handing Lemus a plate of food that he accepted and took inside. The lights inside the apartment appeared to be either off or very dim. Lemus made eye contact with Ward; he appeared to be in a hurry to close the door before Ward could reach it. As Ward approached the door, Lemus slammed it shut, against Ward's arm, and locked it. Ward banged on the door and yelled to announce the presence of law enforcement. He did not receive any response. At the same time, dispatch advised Ward that 911 calls were still coming from the apartment.

One of the men standing outside the door told Ward that Lemus was likely scared

4

as he had been drinking. The man offered to go inside the apartment to get Lemus. The front door to the apartment faced south; the kitchen window and the window of the spare bedroom also faced south; the man slid the bedroom window open and climbed into the apartment. The man subsequently exited through the same window and told Ward that Lemus would come out the front door shortly. When Lemus did not appear, at Ward's request the man again climbed into the apartment, through the window, to open the front door. Although the interior lights were off, Ward could look into the apartment through the window. The man quickly returned to the bedroom, followed by Lemus; the man's demeanor had changed from helpful to frightened. When Ward asked the man "to go to the [front] door just to open it to allow [Ward] to come in," the man responded that "he couldn't do that." As for Lemus, he was telling the man to leave; he also told Ward, in an angry tone, that he could not come in and should leave. Despite Ward's instructions to open the door, Lemus stayed in the bedroom and would not go to the door. At that point, using his flashlight, Ward noticed fresh blood on Lemus's hands, so Ward climbed into the apartment through the south bedroom window.

While Ward was monitoring the apartment's south side, Sergeant Rose Olmos, who had also responded to the apartment complex, was stationed on the apartment's north side. The bathroom as well as Alvarado's bedroom overlooked the north side; the north bedroom was across a small hallway from the south bedroom. Ward informed Lemus of the other officer's presence on the north side, grabbed his arm, and tried to move him towards the front door. Ward testified, "[Lemus] just stiffened up and began resisting while telling me to leave. [¶] ... [¶] ... He actually tried to push me back at that point. And when he did that, I just immediately took him down to the floor, which he landed on the mattress. ... I took him down to the mattress, handcuffed him and then went to the door." Once he was handcuffed, Lemus "stopped any resistance."

As Ward dragged Lemus towards the front door, he began hearing a "consistent knocking, loud knocking." Alvarado had testified that once he knew police were in the apartment, he began kicking the furniture in his bedroom to get their attention. Ward subsequently testified, "As I was exiting the south bedroom, I began hearing [the knocking]. And with it being an apartment complex, I didn't know where it was coming from at first. But as soon as I reached where the north bedroom door was at, I could hear it was coming from that bedroom." The door of the north bedroom was closed but Ward opened it and found Alvardo lying "slightly on his back and left side," "wedged in" between a bed and a dresser.

Ward testified, "[Alvarado] had multiple stab wounds about his torso, neck, arms and a lot of blood. There was—he was soaked in blood. There was blood all over the walls, the furniture." Ward explained, "The blood was real thick. And usually when you see thick coagulated blood, it means—that usually means an artery has been severed and the person is losing a lot of blood and it's life-threatening." Ward immediately called for emergency medical assistance for Alvarado; he also told Olmos to come to the front door and let her into the apartment. Olmos had previously secured the north facing side of the apartment and had not seen anyone enter or leave the apartment on that side. Olmos went to check on Alvarado, who told her that Lemus was responsible for stabbing him. By this time, another police officer, Oscar Vargas, had arrived to assist Ward and Olmos; Alvarado also told Vargas that Lemus had stabbed him.

Alvarado was moved to the living room for stabilization by emergency medical personnel; he was then airlifted to the hospital as a "critical trauma" patient, which meant the hospital's "trauma system" was alerted and a trauma team received him

on arrival. Lemus was detained in the living room. Thereafter, Ward was able to look through the rest of the apartment. He noticed the bathroom window, which was high off the ground, was open. In the kitchen, he saw a Styrofoam plate with barbecued meat and rice—the plate that Lemus was in the process of taking inside when Ward initially approached the apartment door. About three or so hours after Ward had first handcuffed Lemus, he took Lemus to the hospital for a blood draw. Ward testified that after the draw was accomplished, "[Lemus] was sitting in a chair. He was not handcuffed. And he put his hands in front of him and began looking at his hands, almost with a look of disbelief, and his eyes started to tear up." At trial, the parties stipulated that Lemus's blood was drawn on July 17, 2013, and found to have an alcohol content of 0.19 percent.

Detective Cody Dean of the Porterville Police Department arrived at the apartment to assist Ward and Olmos. Dean found a knife on the ground outside the bathroom window, by a bush just to the left of that window; the knife's blade was approximately three inches long and its handle approximately four inches long. The knife had moist blood on it. Dean did not observe any markings consistent with a person climbing out of the bathroom window or landing on the ground outside that window. Dean also inspected the inside of the bathroom. The bathroom window was relatively high up, about five feet above the tub. A person standing on the tub's edge could look out the window. There were two sets of bloody shoe tracks on the tub's edge. Dean testified, "So when I found these bloody shoe tracks on the edge of the tub, it led me to believe whoever threw that knife out the window, those shoe tracks belonged to them standing up on that ledge of the tub and then reaching through and throwing the knife toward the bush where I found it." The soles of Lemus's shoes, which were caked with blood, matched the shoe tracks on the edge of the tub.

Detective Bruce Sokoloff of the Porterville Police Department questioned Lemus shortly after 1:00 a.m. on July 17, 2013. He found Lemus to be evasive. Lemus stated he did not know precisely what happened in Alvarado's apartment, noting he used to live in that apartment. When pressed to explain how Alvarado was injured, Lemus said, "If I told you, you wouldn't believe me." He then indicated a gang member was responsible for the attack but was unable to give any information, even a description, of the purported gang member; nor did he express any interest in having the police track down the gang member. Lemus explained he had blood on his hands because he was "right there," but explicitly denied that he had stabbed Alvarado or was present when Alvarado was stabbed. Lemus acknowledged that the knife found by the police "may be his" and that his fingerprints "may be" on the knife. Lemus said he did not open the door for the police because he was scared.

One of the emergency room physicians who attended Alvarado testified that Alvarado arrived at the hospital in critical condition; he was unable "to maintain breathing on his own" and required immediate surgical intervention to support his breathing. The doctor testified that Alvarado had between 65 to 75 stab wounds on his body. A trauma surgeon who operated on Alvarado also described Alvarado's condition: "It seemed like he had multiple, multiple, multiple stabs, so it was focused on the back, chest; I think, if I remember right, in the gluteal region, buttock area. It was all over the place[,] I think." The surgeon explained that the "stab injuries were real bad. If I remember, he had an injury in the palm, many other areas, which were closed." Alvarado required multiple surgeries during his hospitalization. Although the surgeon was not aware of Alvarado's prognosis on discharge, he testified, "It was pretty bad. I imagine he would have the need for [extended] therapy help." A blood alcohol screening performed at the hospital confirmed there was no alcohol in Alvarado's system.

Lemus testified in his own defense. On July 16, 2013, between 3:30 p.m. and 5:00 p.m., Lemus went to Alvarado's apartment "to see how he was"; Lemus had last seen Alvarado in the first week of April. Lemus also testified that he intended to take Alvarado to the home of Lemus's mother, where Alvarado's sister, who had recently arrived from Mexico, was staying. Since Alvarado was not home, Lemus started hanging out with some of the neighbors whom he was acquainted with. They went to the store a couple of times to buy beer and supplies for a barbecue. Over the course of the evening, Lemus likely had "[m]ore than a 12–pack" of beer.

Alvarado came home at 9:00 p.m. or 9:30 p.m. Alvarado and Lemus embraced and talked for a while. Lemus used his knife to open a beer and cut his hand; Alvarado offered him his shirt to wipe the blood. Lemus offered Alvarado a beer, but, being a Jehovah's Witness, Alvarado "didn't really want a beer." Lemus needed to use the bathroom so they headed to Alvarado's apartment; Lemus likely left the knife outside. After using the bathroom, Lemus lay down on the sofa. A neighbor, Marcos, soon knocked on the door to alert Lemus that the food was ready. Lemus went out, got a plate of food, returned to the apartment, and set the plate on the kitchen island. He thought Alvarado was asleep, so he did not turn on any lights. Lemus was tired and drunk and went back to lie on the couch. Within five or 10 minutes, before he could drift off to sleep, he heard the sound of police radios.

Lemus got up to look for Alvarado. He found Alvarado on the floor of his bedroom. It was dark and Lemus was trying, with the aid of a flashlight on his phone, to ascertain Alvarado's condition. Since Alvarado suffered from asthma, Lemus thought he was experiencing asthmatic symptoms; Lemus "never imagined that [Alvarado] was as injured as he was." Lemus "went toward [Alvarado] to grab onto him and hold him to see what was going on with him." Lemus believed "it was like something like normal. [He] didn't think that it was an accident" or "something life-threatening." Lemus suddenly heard a noise and went to investigate; he looked through the bathroom window, only to hear another noise in the hall; when he ran there he bumped into one of the men who was at the barbecue. The man asked Lemus, "What's going on? There are a lot of police officers outside." Lemus "couldn't answer," he was "stunned" and "got stuck." The man said, "I don't want to know anything" and headed out the front door. Lemus followed him to shut the door and "an officer tried to come in," but Lemus pushed the door shut because he was confused and afraid. Thereafter, Lemus went to investigate a noise in one of the bedrooms and an officer jumped in from the window; the officer grabbed Lemus, handcuffed and detained him. Lemus was dragged to the living room, where he saw medics attending to Alvarado, who was "very bloody." Lemus kept repeating, "I didn't do that." All these events happened in a very short time, minutes even. Lemus acknowledged the knife found outside the bathroom window was his.

Lemus was charged with attempted murder, coupled with the allegation that the offense was willful, deliberate, and premeditated. (Count 1; §§ 187, subd. (a), 189, 664.) He was further charged with felony false imprisonment by violence. (Count 2; §§ 236, 237.) As to both of these counts, the information alleged that Lemus personally used a deadly and dangerous weapon, a knife, and inflicted great bodily injury. (§§ 12022, subd. (b)(1), 12022.7, subd. (a).) Lemus was also charged with resisting a peace officer, a misdemeanor. (Count 3; § 148, subd. (a).) A jury found Lemus guilty of all counts and found true all the associated allegations.

Lemus, 2017 WL 1549930, at *1-6 .

///

**III.    DISCUSSION**

    A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

    B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Petition

Petitioner claims the evidence was insufficient to support the finding that the murder was willful, deliberate and premeditated. Petitioner raised this claim on direct appeal in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Lemus contends the evidence at trial was insufficient to sustain a true finding on the allegation that the attempted murder of Alvarado was willful, deliberate, and premeditated. We reject this contention.
>
> In assessing a claim of insufficiency of the evidence, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66; accord, *People v. Elliott* (2012) 53 Cal.4th 535, 585.) Substantial evidence encompasses circumstantial evidence and reasonable inferences based on that evidence. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.)
>
> "Attempted murder requires (1) a specific intent to kill and (2) a direct but ineffectual act toward accomplishing the intended killing. [Citation.] Unlike murder, an attempted murder therefore requires express malice and cannot be proved based upon a showing of implied malice. [Citation.] Also, unlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.)
>
> In evaluating whether sufficient evidence supports a jury finding that an attempted murder was deliberate and premeditated, we employ the same analysis—based on the three-pronged *Anderson* [FN2.] test—that we use to resolve an insufficiency challenge to a first degree murder conviction. (*Anderson, supra*, 70 Cal.2d at pp. 26–27; *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8 ["We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation."], disapproved on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191, 199; *People v. Brito* (1991) 232 Cal.App.3d 316, 323–324 [applying *Anderson* test to evaluate the sufficiency of the evidence underlying attempted murder conviction].)
>
> [FN2.] *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).
>
> *Anderson* delineates three categories of evidence for reviewing courts to consider in evaluating whether a murder (or attempted murder) was committed with premeditation and deliberation: (1) prior planning activity; (2) motive; and (3) the manner of killing. (*Anderson, supra*, 70 Cal.2d at pp. 26–27.) A verdict of premeditation will typically be upheld when "there is evidence of all three types." (*Id.* at p. 27.) Alternatively, a verdict will be sustained when "there is extremely strong evidence of planning; or evidence of motive in conjunction with either (a) evidence of planning or (b) evidence of a manner of killing showing a preconceived design." (*People v. Brito, supra*, 232 Cal.App.3d at p. 323.) *Anderson*, however, simply serves to guide an appellate court's evaluation of the evidentiary basis of a finding of deliberation and premeditation. (*People v. Pride* (1992) 3 Cal.4th 195,

247.)

Ultimately, a finding of deliberation and premeditation requires the existence of "preexisting reflection, of any duration." (*People v. Solomon* (2010) 49 Cal.4th 792, 813; see *People v. Houston* (2012) 54 Cal.4th 1186, 1216 ["'"[D]eliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"'"]; see also *People v. Pearson* (2013) 56 Cal.4th 393, 443 ["The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand."].) A killing or attempted killing that resulted from an unconsidered or rash impulse is not deliberate and premeditated. (*People v. Pride, supra*, 3 Cal.4th at p. 247.) In sum, "'[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson, supra*, at p. 443.)

Here, there is either direct or circumstantial evidence of all three *Anderson* factors. First, there was evidence of planning activity: Lemus brought a knife along when he came to Alvarado's apartment, he waited for hours for Alvarado to return home, he made ominous comments foreshadowing the events to come, and he took steps to isolate Alvarado in his bedroom at the back of the apartment. Second, the jury could reasonably infer a motive for Lemus to harm Alvarado, based on evidence that Lemus was resentful of, and felt insulted by, Alvarado's recent religious conversion and resultant lack of interest in drinking and socializing with Lemus. Third, the manner of attack—i.e., 65 to 75 separate stabs, including numerous stabs to the torso, and a lack of evidence of provocation or struggle—suggested the attack was systematically executed, in accordance with a preconceived plan to kill Alvarado. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [close-range shooting, without evidence of provocation or struggle, supported inference of premeditation and deliberation]; *People v. Marks* (2003) 31 Cal.4th 197, 230 [same]; *People v. Pride, supra*, 3 Cal.4th at pp. 247–248 [manner of killing "evidence[d] reflection" rather than an explosion of violence where the defendant inflicted numerous stab wounds, virtually all in the torso].)

We will briefly summarize the salient evidence in the record. After several months apart, Lemus suddenly came to Alvarado's apartment armed with a knife. Upon finding that Alvarado was not home, Lemus waited several hours for him to return. When Alvarado finally returned, Lemus made ominous comments that made Alvarado nervous and fearful. Lemus told Alvarado that Lemus had "sold [his] soul to the devil" and that "[t]onight, blood's going to run." Lemus also said he had not come to visit Alvarado recently because Alvarado had taken to carrying around the Bible. Further, knowing that Alvarado did not drink because of his new faith, Lemus nonetheless pressed Alvarado to have a beer; Alvarado took one because he "was in fear."

Lemus then concocted a ruse to go into Alvarado's apartment. Rather than sitting down in the living room, he went towards the back of the apartment, to Alvarado's bedroom. He looked around the room, opening drawers, and queried Alvarado as to whether anyone else was living at the apartment at the time. Alvarado thought this behavior was "strange." Lemus, evidently insulted that Alvarado had undergone a religious conversion and would no longer drink and socialize with him, questioned Alvarado about his newly abstemious habits. He challenged Alvarado: "And so you think you're a bigger fucker than me[?]"

Then, sitting next to Alvarado on the bed, with the lights turned off, he proceeded to stab Alvarado repeatedly. When Alvarado stood up, Lemus rose too and

11

continued to stab Alvarado, at one point piercing through Alvarado's palm, which Alvarado had raised up to protect his heart. When Alvarado collapsed in an extremely narrow space between the bed and the dresser, Lemus continued to stab him, trying to get at his heart. Lemus stopped only when a neighbor came to the apartment looking for them; Lemus then washed his hands at the bathroom sink. Shortly thereafter, when the neighbor returned to tell Lemus to open the door for the police, Lemus had the presence of mind to ask who had called the police. Lemus then went back to Alvarado's bedroom and shone a light on Alvarado's face, apparently to make sure he was dead; he stabbed Alvarado one more time in his back before tossing the knife out of the bathroom window.

This record discloses persuasive evidence that Lemus had planned the attack in advance, and its systematic manner of execution further suggests that he carried it out in accordance with a preconceived design. There was also some evidence from which the jury could infer a motive for the attack. Lemus and Alvarado had a long, close relationship that had recently grown distant. Lemus appeared to resent Alvarado's religious conversion and consequent lack of interest in drinking and socializing. The jury could reasonably infer from this evidence that Lemus felt insulted or rejected, motivating him to harm Alvarado.

Given the evidence of planning, motive, and manner of attack, a reasonable trier of fact could properly conclude that the attempted murder was the result of preexisting reflection rather than a rash impulse, i.e., that it was deliberate and premeditated. That the evidence could also """"reasonably be reconciled with a contrary finding""""" is not a basis for reversal. (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

Lemus, 2017 WL 1549930, at *6-8.

1. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

2. Analysis

Respondent argues that Petitioner fails to present a colorable claim. The Court agrees. Petitioner fails to make a showing that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court authority, or was an unreasonable determination of the facts. Petitioner merely disagrees with the outcome. He argues that his version of the facts is the correct version, and if the appellate court had credited his explanations, the outcome would have been different. However, the Court must assume that the jury resolved any conflicting facts in favor of the prosecution. Jackson, 443 U.S. at 326. The reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). As Respondent notes, Petitioner has "ignored 'the only question that matters under § 2254(d)(1),'"

which is whether the state court decision is contrary to, or an unreasonable application of, the Jackson standard. Richter, 562 U.S. at 102 (quoting Lockyer v. Andrade, 538 U.S. 63, 71 (2003)).

After viewing the evidence in the light most favorable to the prosecution, it is clear that a rational trier of fact could have determined that the attempted murder was willful, deliberate and premeditated. As discussed by the Fifth DCA, there was substantial evidence of planning activity. Petitioner brought a knife with him and waited for several hours until the victim showed up. He made several remarks foreshadowing the events, such as "Tonight, blood's going to run," and "I've sold my soul to the devil." Lemus, 2017 WL 1549930, at *2. Petitioner also succeeded in separating the victim from the group and isolating him in his bedroom. The appellate court next noted there was substantial evidence of motive. Petitioner and the victim had been close friends but had grown apart due to the victim's religious conversion. There was evidence that Petitioner was resentful of, or felt insulted by, the victim's conversion and resultant lack of interest in drinking and socializing with Petitioner. When Petitioner asked the victim why he no longer wanted to drink, the victim responded, "I no longer want to live that way. I have two children." Id. Petitioner replied, "And so you think you're a bigger fucker than me." Id. Finally, the state court reasonably found that the manner of attack suggested a systematic execution in accordance with a preconceived plan to kill the victim. Id. Once they were alone, and without any provocation, Petitioner stabbed the victim 65 to 75 times. Id. Later when police arrived, Petitioner returned to the bedroom and shined a light on the victim's face. Id. The victim attempted to play dead by holding his breath and keeping his eyes open without blinking. Id. Not satisfied, Petitioner then stabbed the victim in the back once more, apparently to make sure he was dead. Id.

In light of the above, Petitioner fails to show that no rational trier of fact would have agreed with the jury's determination. He fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the Jackson standard. The claim should be denied.

///

## IV. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **May 7, 2019**              **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE